For the foregoing reasons, the judgment is affirmed.

York, P. J., and Doran, J., concurred.

[Civ. No. 13018. First Dist., Div. One. June 17, 1946.]

HAZEL WILMERTON, as Executrix, etc., Respondent, v. A. W. MORTON, Appellant.

Joseph A. Brown for Appellant.

Malone & Sullivan for Respondent.

PETERS, P. J.—Plaintiff, executrix of the estate of her mother, brought this action against defendant for damages, it being alleged that defendant, in violation of the terms of a lease, wrongfully removed from the leased premises a certain refrigeration system. The trial court found in favor of plaintiff and defendant appeals.

The facts are as follows: In 1932 plaintiff's mother owned a three-story apartment house in San Francisco which contained eighteen 2-room apartments. In August of 1932 defendant, by written contract, leased that apartment house from its owner for a period of five years, with an option in the lessee for an additional five-year term. The option was exercised by defendant so that he held the premises under the lease until August of 1942. When the premises were leased

in 1932 there was no electrical refrigeration system in the building. Each kitchen then had a conventional cooler of the shelved compartment type, with a small opening in the exterior wall of the building which was screened to allow the admission and circulation of air. Early in 1936, defendant, the lessee, installed in the leased premises a Kelvinator multiple unit electrical refrigeration system. Defendant purchased the system secondhand for $150. What it cost to install does not appear. It was composed of a central plant consisting of a compressor and motor, which was installed in the basement of the premises, and from this control plant copper tubing branched out to the refrigerating units located in each of the eighteen apartments. In the cooler in each kitchen a freezing unit was installed. To do this the shelving was taken out. There is a conflict as to whether any structural changes in the building were made. This conflict must be resolved in favor of respondent. Her testimony and that of an independent witness was to the effect that the floor in each cooler was removed, and that the freezing units were about a foot deeper than the coolers. As a result, defendant cut large holes in the exterior of the building and then constructed box-like additions over the holes to accommodate the freezing units. Just how the tubing from the basement plant to the freezing units was installed is not clear. Defendant testified that he had his employees run the tubing along the ceiling of the basement and then up the exterior walls of the building, at least on the west side. He was not certain whether the tubing went up the exterior walls on the east side or up through the partitions.

Defendant surrendered the premises on the expiration of the lease as extended in August of 1942. In February or March of that year he removed the entire refrigeration system from the leased premises and installed the same in another apartment house operated by him. It was still being used in that apartment at the time of trial, which was in January, 1945, except that a new motor had been installed and other repairs costing about $700 made.

The theory of this action is that the refrigeration system installed by the lessee belonged to the lessor under the express terms of the lease, and that the lessee acted wrongfully in removing it. The lease is a printed form of lease. It provides that the lessee shall keep the premises in repair, and shall not alter or repair or improve the premises without the

written consent of the lessor. It is then provided that "all such alterations, repairs, additions, or improvements, (except counters, shelving and movable partitions placed therein by the lessee for the requirements of his business), shall, unless otherwise provided by written agreement, be the property of the lessor and shall remain upon and be surrendered with the premises upon the expiration of this lease or any sooner determination thereof. . . ."

In his opening brief defendant argues that the refrigeration system was not so annexed to the realty as to become a part thereof, but constituted a trade fixture which he had the legal right to remove before surrendering the leasehold. This argument is not referred to in the closing brief. The reason for this apparent abandonment of the point is obvious. The rules applicable to trade fixtures as between lessor and lessee are rules that apply by operation of law when the lease is silent. While it would appear that the material changes here made in the exterior and interior of the building make it at least doubtful whether the trade fixture rule would apply, it is not necessary to determine whether that rule is or is not applicable. ■ The rule is well settled in this and other states that a lessor and lessee can covenant away any rights that they might otherwise have under the trade fixture rule, and that where the contract speaks on the subject it controls the implications that might otherwise arise under that rule. The leading case in this state is *Realty Dock etc. Corp.* v. *Anderson,* 174 Cal. 672 [164 P. 4]. In that case the premises were leased for banking purposes, and the lessee installed a safe deposit vault in the basement of the leased property. The question was whether the lessee had the legal right to remove the vault on the termination of the lease. The lease there contained a covenant almost word for word the same as the one here involved. The trial court found that the vault was a trade fixture and could be removed by the lessee. In reversing the case the Supreme Court used the following language which is equally applicable to the present appeal (p. 676):

"We do not think, however, as we have just said, that the finding of the court, in as far as it determines that the vault is a trade fixture and that it could be removed from the building without causing any injury thereto, is of any consequence. Nor do we think it of any moment in the consideration of this appeal whether the vault was imbedded in or affixed to the main building and had become an integral part thereof, except

in so far as these matters may bear on what we consider the determinative question in the case, namely, whether its construction constituted an 'alteration, addition, or improvement' in the premises which, under the terms of the lease, inured to the lessor. It is not a matter of controlling importance whether the vault as constructed was a permanent or a movable fixture. We are not here considering the rights arising by operation of law only between landlord and tenant as to the articles placed upon the leased premises by the latter. On the contrary, these rights are to be determined from the terms of the lease under which the parties undertook to fix them. The lease provided that no 'alterations, repairs, or changes' should be made by the tenant except with the consent of the lessor and that as to them, provided that all 'alterations, additions, and improvements' should be the property of the lessor. This vault was built under the terms of the lease and with the consent of the lessor. Hence, the only question is, Did this construction of the vault result in an 'alteration, addition, or improvement' to the premises leased? If it did not, the defendants as representing the lessee, had a right to remove it as they did. If it did, then it belonged to the plaintiff and the defendants had no right to interfere with it.

"It appears to us as assuming rather an idle task if we were to discuss at length the question whether the character of this vault built by the bank did or did not constitute 'an alteration, addition, and improvement' in the premises. It is, of course, quite apparent that the term 'improvement' is comprehensive enough to embrace all additions or alterations which may be made by a tenant for the convenience of his business upon the premises. It is much more comprehensive than the word 'fixture,' and while including these, includes also many things that may not be classed as fixtures. In fact, if force is to be given to a provision in a lease which provides that all 'improvements' made in premises shall inure to the lessor, it is difficult to conceive of any subsequent addition, alteration, or repair to the premises during the tenancy which would not be embraced within the term 'improvement.' That the construction of this vault was intended to and did amount to all of these—an addition, alteration, and improvement—and was embraced within the terms of the lease we think is evident." (For cases reaching a similar

conclusion see *R. Barcroft & Sons Co.* v. *Cullen*, 217 Cal. 708 [20 P.2d 665] ; *Parker* v. *Wulstein*, 48 N.J.Eq. 94 [21 A. 623] ; *French* v. *Mayor etc. of New York*, 29 Barb. (N.Y) 363 ; *Harris* v. *Kelly* (Pa.), 13 A. 523 ; *Wright* v. *La May*, 155 Mich. 119 [118 N.W. 964] ; *In re Bahl's Ice Cream & Baking Co.*, 195 F. 986 ; *Levin* v. *Improved Property Holding Co.*, 141 App. Div. 106 [125 N.Y.S. 963].)

 Tested by the rules laid down in the Realty Dock case, *supra*, and the other cases cited above, there can be no doubt at all that the finding of the trial court that the refrigeration installation constituted an alteration, repair, addition or improvement to the building is amply supported by the facts. Whether it was removable or nonremovable, is a false factor. That question would be pertinent only if the contract were silent. But since the parties have spoken, it is their expressed intent that must control. Under the covenant reasonable minds cannot but agree that the refrigeration system here involved was an improvement, an addition or an alteration in the premises.

 The second main contentions of defendant are that the findings as to damages are unsupported, and that the damages are excessive. There is no merit in these contentions. Wallace Scott, a qualified refrigeration expert, testified that he had seen and serviced the unit in question shortly after it was installed in the premises here involved, and that he had seen the equipment after it was removed by defendant and installed by him in another apartment house. He testified that, except for the replacement of the motor, the system he had seen in the new building was the same as that installed in plaintiff's premises; that in March, 1942, the replacement value of that system was between $110 and $125 per unit, or between $1,980 and $2,250 for the entire assembly. This he fixed as the value to the building of the installation. He assumed this was the value in fair operating condition, and stated if the system needed repairing, its value to the building would be the value fixed less the cost of repairs. The useful life of such a complete unit he fixed at about thirty years. Another witness, a real estate appraiser, gave it as his opinion, that the building deteriorated between $2,500 to $3,000 as the result of the removal. Defendant attacks this opinion evidence and urges that his witnesses who testified that in March of 1942 an entire refrigeration assembly similar to the one here involved could be purchased for $150,

should be believed. The point need not be labored that the weight to be given the evidence was for the trial court. It found that the reasonable replacement value of the refrigeration system, in place, immediately preceding defendant's wrongful removal, was $1,500. This finding is amply supported by the evidence of Scott who fixed the value at between $1,980 and $2,250. If the cost of repairs be deducted the finding of $1,500 damage is approximated. ■ That the proper measure of damages was applied is clear. As early as *Rhoda* v. *Alameda County*, 58 Cal. 357, it was established that the proper measure of damages for the wrongful removal of a fixture is the value of the fixture in place as part of the realty, and not what it would sell for on the open market removed from the building. This rule has been reaffirmed as recently as 1942 in *Givens* v. *Markall*, 51 Cal.App.2d 374 [124 P.2d 839].

The last point urged by defendant is that plaintiff was under a duty to minimize damages but failed to do so. It is undeniably the rule that in general a person wronged at law must make reasonable efforts to prevent expansion of his injury. (See discussion 8 Cal.Jur. § 41, p. 779.) But that rule has no application to this case. Appellant assumes that the testimony of his witness that such a system could be purchased in March of 1942 for $150 is controlling, and upon this assumption argues that plaintiff should have purchased a system for that amount and thus minimized damages. This is but another way of arguing that the finding as to damages is unsupported. The trial court, on conflicting evidence, fixed the replacement value at the time of removal at $1,500. That finding is supported. The trial court apparently was not impressed with the evidence that the system could then be bought for $150. It did not choose to follow that testimony, but relied on the testimony of plaintiff's witnesses. ■ It is not our function or within our power to pass on which witnesses should be believed. That was the function and within the power of the trial court. Its finding, based as it is on substantial although conflicting evidence, cannot be disturbed by this court.

The order denying the motion for a new trial is nonappealable. The appeal therefrom is dismissed. The judgment is affirmed.

Knight, J., and Ward, J., concurred.